UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                  Case No. 07-CR-243

HILDA ALAYETO and VICTOR GONZALEZ,

      Defendants.

**RECOMMENDATIONS ON DEFENDANTS' MOTIONS TO SUPPRESS
AND ALAYETO'S MOTION TO DISMISS**

### I. PROCEDURAL BACKGROUND

On September 25, 2007, a grand jury sitting in the Eastern District of Wisconsin returned a single count, superseding indictment alleging that on July 4, 2007, Hilda Alayeto ("Alayeto") and Victor Gonzalez ("Gonzalez") possessed with intent to distribute five (5) grams or more of a mixture containing cocaine base, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2.

On October 4, 2007, Alayeto and Gonzalez were arraigned, and both entered pleas of not guilty. On October 24, 2007, in accordance with the pretrial motion schedule, Alayeto filed a motion to suppress evidence and statements and requested an evidentiary hearing. On October 28, 2007, Gonzalez filed a motion to enlarge time to file pretrial motions and concurrently filed a motion to suppress evidence. His motion to enlarge time was granted, and the court accepted his motion to suppress. On November 7, 2007, Alayeto filed an amended version of her original motion in order to correct a scrivener's error.

On November 9, 2007, the court conducted an evidentiary hearing. On November 28, 2007, the parties simultaneously filed briefs in support of their respective positions on the issues raised by the defendants in their motions to suppress. On that same date, Alayeto filed a motion to dismiss the indictment. On November 30, 2007, the government filed a brief in opposition to Alayeto's motion to dismiss. Consequently, the defendants' motions are now fully briefed and are ready for resolution. For the reasons which follow, the court will recommend that the defendants' motions to suppress evidence and statements be denied, and further will recommend that Alayeto's motion to dismiss be denied.

## II. FACTUAL BACKGROUND

Three witnesses testified for the government at the evidentiary hearing: Milwaukee Police Officer Kurt Lacina ("Lacina"), Milwaukee Police Officer Jason Rodriguez ("Rodriguez"), and Milwaukee Police Detective Harold Young ("Young"). Neither Alayeto nor Gonzalez called any witnesses or testified on their own behalf. The following is a summary of the witnesses' testimony of the events that occurred relevant to these motions.

At all times relevant to these motions, Officers Lacina and Rodriguez were assigned to the Milwaukee Police Department's ("MPD") anti-gang unit in District 5. In July of 2007, the unit had been investigating the "East Side Mafiosos," a gang known to have associates in District 5, for approximately six months. As part of the investigation, officers in the unit had identified known gang associates and met weekly to exchange information about those identified individuals. Several times a week, the officers in the unit would run status checks on the identified associates, gathering information on associates' recent citations, outstanding warrants, driver's license status, and

2

probation status. The anti-gang unit had identified both Alayeto and Gonzalez as known gang associates, and therefore, the officers often checked the status of both defendants.

On July 4, 2007, at approximately 8:00 p.m., before dark, Officers Lacina and Rodriguez were in an unmarked vehicle traveling eastbound on Center Street in Milwaukee. As the officers approached the intersection of Center and Buffum Streets, they observed a black Lincoln LS, motor vehicle, driving southbound on Buffum Street and coming to a stop at the intersection. Gonzalez was driving; Alayeto was the front seat passenger; and a third party, Nathaniel Woods, was seated behind Gonzalez in the rear seat. Upon observing the Lincoln, Officer Rodriguez stated, "There's Bebe," referring to Gonzalez. Officers Lacina and Rodriguez were well-acquainted with Gonzalez as they each had known him for years in their capacities as officers in District 5. Officer Rodriguez then drove the unmarked squad car into the intersection, stopping on an angle in front of the black Lincoln in such a way as to prohibit the ordinary progress of the Lincoln. During the hearing, both officers testified that they stopped the Lincoln because they knew Gonzalez's driver's license had been revoked for several months.

Immediately after stopping the Lincoln, the officers exited their vehicle and approached the Lincoln. Officer Lacina testified that as he approached the car he commanded the passengers to "get their hands up," but the defendants did not immediately comply. Looking through the Lincoln's windshield when he reached the front driver's side of the car, Officer Lacina observed Gonzalez toss a clear plastic baggie containing a white chunky substance to Alayeto. Officer Lacina believed the baggie to contain crack cocaine. Officer Lacina then saw Alayeto shove the baggie down the front of her pants. Eventually, all of the passengers exited the vehicle, and Gonzalez and Alayeto were placed under arrest.

3

After her arrest, officers transferred Alayeto to the District 5 police station, where, at approximately 11:30 p.m., she was interviewed by Detective Young. Detective Young met Alayeto in a conference room, where he interviewed her for approximately twelve (12) minutes. The entire interview was recorded by a device in Detective Young's pocket and was played for the court in its entirety during the evidentiary hearing. Detective Young informed Alayeto that she was under arrest for possession with intent to deliver cocaine. Then Detective Young advised Alayeto of her *Miranda* rights by reading them off a card issued by the State of Wisconsin and asked her if she understood those rights. Alayeto indicated that she understood. Detective Young then asked Alayeto if she would answer questions without a lawyer present. Alayeto responded that she would not.

Continuing with his standard procedure, Detective Young then began to explain to Alayeto the arrest procedure and what she could expect to happen next. He told her that she was currently at District 5 and would be transferred to the city jail downtown or directly to the county jail and that Gonzalez had also been arrested. At that point, Alayeto stated that the drugs were hers and did not belong to Gonzalez. There was then some additional discussion about a previous conversation between Alayeto and Officer Lacina where Alayeto's possible cooperation was discussed.

On November 3, 2007, six (6) days before the evidentiary hearing, Officers Lacina and Rodriguez again arrested Alayeto, this time based on a state arrest warrant. The officers took Alayeto to the District 5 police station where she and Officer Rodriguez sat alone in a small booking room in the garage of the police station. Officer Rodriguez testified that during that time, he and Alayeto "had a conversation" about the upcoming evidentiary hearing in this case. He testified that "I told her that the deal that I was under the impression that she was going to make with us was gonna be off if she contested this at this hearing. I told her exactly what was going to happen." He remembers

4

stating that, "[i]f you guys go through with this court date on Friday this deal is off for you and Victor." He further testified that he may have stated that, "You know you're going to court on Friday"; "We're not going to play these bullshit games with you"; "You're going to lose"; and "Sometimes lawyers do stuff that you don't want them to do." Alayeto was released from state custody two or three days later.

### III. DISCUSSION

#### A. Motion to Suppress

The defendants move the court to suppress physical evidence obtained as a result of the traffic stop, arguing that the officers did not have probable cause to stop the Lincoln. Alayeto further moves the court to suppress the statement made by her to Detective Young, arguing, in the first instance, that the statement was not sufficiently attenuated from the illegal stop to purge the statement of the stop's taint. In the alternative, Alayeto argues that her statement must be suppressed because her statement was not made voluntarily. Accordingly, this court must answer the following questions: (1) whether Officers Lacina and Rodriguez had probable cause for the traffic stop; (2) whether defendant Alayeto's post-arrest statement was tainted by any such unlawful stop; and (3) whether defendant Alayeto voluntarily made a statement to Detective Young.

*1. The Traffic Stop*

Alayeto and Gonzalez both move the court to exclude any physical evidence obtained as a result of the July 4, 2007 traffic stop. They argue that the officers' stated reason for stopping the Lincoln, that they had obtained knowledge of Gonzalez's revoked driver's license in the week or so prior to the stop, is not sufficient to establish probable cause for the stop. Alternatively, they argue that the officers' statements as to probable cause are not credible. Because such information is

5

sufficient to establish probable cause for a traffic stop in the Seventh Circuit and because the court finds the officers' testimony, as to that particular factual detail, credible, the court will recommend that the motions to suppress physical evidence be denied.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the provisions." *Whren v. United States*, 517 U.S. 806, 810 (1996). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. *Id.* As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Id.*

In the Seventh Circuit, information of a suspended driver's license, obtained a week or so prior to the actual stop, is sufficient to establish probable cause to conduct a traffic stop. *United States v. Hope*, 906 F.2d 254, 258 (7th Cir. 1990). In *Hope*, the Seventh Circuit Court of Appeals reviewed a case with facts remarkably similar to those in the case at hand. In that case, Chicago Police Officers Duane Leonard ("Leonard"), James Naughtry ("Naughtry"), and John Cotter ("Cotter") were assigned to a tactical unit which focused on gang activity and narcotics. *Id.* at 256. Driving an unmarked squad car, the officers recognized the defendant, William Hope ("Hope"), as the driver of an automobile. *Id.* at 256-57. The officers were familiar with Hope as he was known to be a leading member of the notorious Black Gangsters Disciples gang in Chicago. *Id.* at 257. The officers also knew, based on a status check run a week or so earlier, that Hope's driver's license had been suspended. *Id.* Based upon that information, the officers pulled over Hope's vehicle. *Id.* Hope

6

was placed under arrest and was subsequently indicted after he was unable to produce a valid driver's license and after a routine search of the interior of Hope's car produced a bullet and a loaded .38 revolver. *Id*.

Hope argued that the probable cause relied upon by the officers, setting off the chain of events that led to his arrest, was predicated on stale information. *Id*. The Seventh Circuit Court of Appeals disagreed. *Id*. The court held that the officers' knowledge, obtained approximately a week earlier, that Hope's driver's license had been suspended, was "sufficient . . . to warrant the belief that Hope was operating a vehicle without a valid driver's license in violation of state law, and thus [the officers] had probable cause to arrest Hope." *Id*. at 258.

This court finds credible the testimony of Officers Lacina and Rodriguez that within the week or so prior to stopping Gonzalez they had run a status check on him which revealed that his driver's license had been revoked, and further, that the officers stopped the Lincoln based on that information. Let's be blunt. The anti-gang unit had targeted Alayeto and Gonzalez as associates of the East Side Mafiosos. As police officers in that unit, Lacina and Rodriguez were undoubtably continuously seeking out reasons to stop known associates like Alayeto and Gonzalez. Such being the case, the court has no doubt that, in that capacity, the officers were well aware of Gonzalez's revoked driver's license when they stopped the Lincoln. Indeed, it is uncontested that Gonzalez's driver's license was in fact revoked at that time. Therefore, the officers had probable cause to stop Gonzalez.

Having made such a determination, however, the court nevertheless feels compelled to note that the defendants' concern about the veracity of both Officers Lacina and Rodriguez does not fall upon deaf ears. While on the stand, both Officers Lacina and Rodriguez appeared unusually nervous and were easily confused by counsels' even straightforward questions. The officers seemed to try

7

to embellish the reasons for the traffic stop, each hastening to add that the Lincoln's front license plate was missing and that a city arrest warrant had been issued for Alayeto.

In the end, however, after cutting to the quick of the officers' testimony, the court is certain that: (1) Alayeto and Gonzalez were known to both officers as associates of the East Side Mafiosos and (2) in their capacity as officers in the anti-gang unit, the officers ran status checks on Alayeto and Gonzalez on at least a weekly basis. Thus, the court believes that the officers were aware of Gonzalez's revoked driver's license within a week or so before the arrest and that, at a minimum, they stopped him based on that information.

The defendants also ask the court to find relevant to the motion to suppress the officers' post-arrest conduct, including an allegedly warrantless arrest of Alayeto and improper comments made to Alayeto by Officer Rodriguez only six (6) days before the evidentiary hearing. Because these events occurred after the July 4, 2007 stop, the court does not find them relevant to determining whether the officers had probable cause for the traffic stop

*2. The Statement*

The court's finding that the officers had probable cause to stop the Lincoln on July 4, 2007 renders moot Alayeto's argument to suppress her statement to Detective Young on the grounds that the statement was tainted by the unlawful stop. In the alternative, Alayeto argues that her statements to Detective Young should be suppressed because the statements were not voluntary. After listening to the testimony of Detective Young and to the tape recording of Detective Young's interview with Alayeto, this court finds such allegations to be unfounded. Therefore, the court will recommend that Alayeto's motion to suppress statements also be denied.

8

A trial court may admit an admission into evidence only if the accused made it voluntarily. *United States v. Williams*, 128 F.3d 1128, 1131 (7th Cir. 1997). "A confession is voluntary if in light of the totality of circumstances, it was 'not secured through psychological and physical intimidation but rather was the product of a rational intellect and a free will.'" *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002) (citing *United States v. Sablotny*, 21 F.3d 747, 751-52 (7th Cir. 1994)). Such circumstances include but are not limited to "whether the defendant was read his *Miranda* rights, the defendant's age, the duration and nature of the questioning, and whether the defendant was punished physically." *Id*. Only if circumstances "demonstrate that police coercion or overreaching overbore the accused's will and caused the confession" is an incriminating statement involuntary. *Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004).

Based on the totality of the circumstances leading to Alayeto's admission, that admission was clearly voluntary as it was a product of a rational intellect and free will. Detective Young entered the room, introduced himself to Alayeto, and immediately read Alayeto her *Miranda* rights. Alayeto asked for clarification of those rights and later confirmed to Detective Young that she understood them. The following is the exchange that immediately followed the reading of the *Miranda* rights, which led to the admission Alayeto seeks to suppress:

> Young: Do you understand each and every one of those rights I just explained to you?
>
> Alayeto: Uh huh.
>
> Young: Is that yes?
>
> Alayeto: Yes.

Young: OK. Having these rights in mind are you willing to answer questions right now without a lawyer present?

Alayeto: No.

Young: You don't want to answer questions now?

Alayeto: No, I want to wait for an attorney.

Young: OK. If that's what you want to do. That's no problem. Alright, just to let you know uh, what's gonna to happen . . .

Alayeto: I don't understand what's this, like what's what's gonna to happen?

Young: Well, that's what I'm getting ready to tell you. What's gonna happen is that you've been arrested with a large quantity of cocaine, or crack cocaine, and you're going to be transferred from here, downtown. Possibly to the city jail - depends on processing. You might just go straight to the county jail. What's going to happen is that you, along with the other guy, I don't know if he's your boyfriend, another guy, Victor. And he's also got arrested for the drug charges. And . . .

Alayeto: Well they weren't his. Those are mine though. And that's not my boyfriend.

Young: OK. Well, he's under arrest for it though and he'll be going downtown also, separately of course.

(Gov't's Ex. 2, 3:02-4:11.)

Detective Young acted scrupulously in interviewing Alayeto. He carefully read Alayeto her rights, made certain she understood them, and honored her request to have an attorney present during questioning. As he was explaining to her what she could expect to happen next, he in no way acted

10

in a calculated or deceptive way to overcome Alayeto's free will. Alayeto's admission that "the drugs are mine" was in no way elicited by Detective Young. Instead, the admission was made spontaneously by Alayeto as result of her free will. Therefore, her admission is admissible, and this court will recommend that Alayeto's motion to suppress her statement be denied.

### B. Alayeto's Motion to Dismiss

Defendant Alayeto filed a motion to dismiss the indictment against her as a sanction for outrageous government conduct. Specifically, Alayeto argues that

> the misconduct of Milwaukee Police Officer Jason Rodriguez in connection with the November 3, 2007 arrest of Alayeto in which he communicated to her about the conduct of the November 9, 2007 evidentiary hearing in this matter, though Officer Rodriguez knew Alayeto to be represented by counsel in this matter, is so outrageous that due process principles should absolutely bar the government from invoking judicial process to obtain a conviction.

(Def's Br. at 1.)

To be sure, the evidence adduced at the evidentiary hearing demonstrated that a mere six (6) days prior to the evidentiary hearing Officer Rodriguez arrested Alayeto on a matter unrelated to the instant prosecution. At that time, she was taken to the Fifth District police station where Rodriguez discussed with her, *inter alia*, the then-upcoming evidentiary hearing. As his testimony is recounted in the defendant's brief, Rodriguez

> admitted that he talked about the motion proceedings, though he knew she was represented by counsel. He testified that "I told her that the deal that I was under the impression that she was going to make with us was gonna be off if she contested this at this hearing. I told her exactly what was going to happen." He testified that he could have told her "You know you're going to court on Friday." He testified that he could have told her "We're not going to play these bullshit games with you." He testified that he could have said "I don't know if you're playing or not." He testified that he did say that "if you guys go through with this court date on Friday this deal is off for you and Victor." He testified that he may have told her "you are going to lose." He testified that Alayeto said she did not know what her lawyer was doing, to which he replied that "Sometimes lawyer do stuff that you don't want them to do."

11

> He may have said to her something like "you need to talk with your lawyer and let him know that you don't want to go through with this."

(Def's Br. at 3; transcript citations omitted.)

Alayeto did not testify at the evidentiary hearing. Thus, the precise contours of Rodriguez's remarks to her on November 3, 2007 at the police station are not entirely certain. Nevertheless, it is clear that Officer Rodriguez did discuss with Alayeto the then-upcoming evidentiary hearing and attempted to dissuade her from proceeding with the same. He did this well knowing that she was represented by counsel.

That Rodriguez seems to have initiated such discussion with Alayeto is troubling. Such conduct should not be condoned. That having been said, however, Rodriguez's conduct cannot form the basis for dismissal of the indictment.

First of all, Alayeto has not demonstrated how she has been prejudiced by Rodriguez's behavior. More particularly, Rodriguez's alleged attempts to dissuade Alayeto from going forward with the evidentiary hearing failed. Even more significantly, Rodriguez's behavior did not result in the obtaining of additional evidence against Alayeto, such as an inculpatory statement.

Second, Alayeto's motion must fail for the simple reason that the Seventh Circuit does not recognize "outrageous government conduct" as a basis for the wholesale dismissal of a criminal prosecution. Indeed, in *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995), the court had this to say about the doctrine of outrageous governmental conduct:

> Prosecutorial misconduct may precipitate a reversible error, but it is never in itself a reversible error. In great tension with this principle, there are intimations that "outrageous governmental misconduct" is an independent ground for ordering a new trial in a federal criminal case; but we agree with the First Circuit that "the doctrine [of outrageous governmental misconduct] is moribund." "Stillborn" might be a better term, for it never had any life; and it certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine. Today we let the other shoe

> drop, and hold that the doctrine does not exist in this circuit. The gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted.

*Id*. at 241 (citations omitted). To be sure, although the Seventh Circuit more recently observed that the Supreme Court in *United States v. Russell*, 411 U.S. 423, 431-32 (1973), may have left open the possibility of the dismissal of an indictment based on outrageous governmental conduct, the court hastened to add that "we have never taken what we see to be an extreme step of dismissing criminal charges against a defendant because of government misconduct. Granting such relief in the absence of prejudice to a defendant would be to confer an unearned windfall." *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006).

Just so here. While it may have been improper for Officer Rodriguez to engage Alayeto in conversation about her upcoming evidentiary hearing and attempt to "get between" her and her lawyer with respect to the advisability of going forward with her motion to suppress, Rodriguez's doing so resulted in no prejudice to Alayeto. Such being the case, Alayeto's motion to dismiss the indictment based on such conduct must be denied.

**NOW THEREFORE IT IS RECOMMENDED** that the defendants' motions to suppress evidence (dkt # 20, 24) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress statements (dkt #24) be denied;

**IT IS FURTHER RECOMMENDED** that defendant Alayeto's motion to dismiss (dkt #35) be denied.

13

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

**SO ORDERED** this 4th day of December 2007 at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge